Okay, the next argued case is number 19, 1207, C.P. Calco, U.S., Incorporated, against the United States. Ms. Noonan? May it please the Court, for the record, my name is Nancy Noonan. I'm from ErrantFox. I've got my colleague, Frederick Gorgans, at counsel table with me. We represent the plaintiff appellant, C.P. Calco, U.S., Inc. This case is about the U.S. Department of Commerce's calculation of normal value in the anti-dumping duty investigation on xanthan gum from China for a company known as Fufeng. Commerce treats China as a non-market economy country. Anybody get the thing translated, the two paragraphs? Did you get it translated? No, Your Honor. Did anyone, to your knowledge, get it translated? To my knowledge, no one got it translated. Certainly, it was never put on the record as being translated. I mean, I find this entire exercise to be unusual. I have seldom seen the CIT strongarm, Commerce, as much as they did here, and I'm not sure what to make of the two paragraphs that aren't translated and whether Commerce has the discretion to decide what to do with the document in a case like that. I mean, we have so many cases. Commerce has the authority to use best available information. I mean, they have so many rights and so much discretion to choose what data that they're willing to rely on and not. When a foreign entity submits a document that's not entirely translated, it's hard for me to imagine that I'm the best person to decide whether the untranslated part is important or not or whether Commerce ought to be able to disregard it. So I'm kind of confused by this case. Sure, Your Honor, and we were very surprised by the court's fourth remand determination as well when the court insisted that Commerce use the untranslated. Right. No choice. No choice. Even said, translated, don't translate it. We don't care. Just use it. The CIT gave them no choice. No choice. We completely agree. And just to back up a little bit on the timing of the whole case, because I think that that goes to the reasonableness of Commerce's actions in that they're really in- But Fufeng have submitted a full translation, and I don't mean when they submitted the document because they alleged that there was an administrative error oversight in non-translating it, the portion. Is there any opportunity through any of this process where they could have made a motion to supplement the record with such evidence? Is there anything in the procedures before Commerce that allow them to make such a motion? Right. And I do think the timing is very relevant, Your Honor. First, this case was initiated back in July. The first, the Tai Ajinomoto financial statement was placed on the record on October 26, 2012. Fufeng had a rebuttal submission as well. Fufeng had at that time put other financial statements on the record, not the one at issue, not the fermentation financial statement at issue. Then Commerce makes its preliminary determination using the Ajinomoto financial statement. Fufeng then, in a subsequent post-preliminary surrogate value submission on February 22, 2013, which was still timely in all fairness, files this new document. But three weeks later, case briefs are due. Commerce is under 135... It files a new document? What new document? Files the fermentation financial statement. For the first time, it went on the record on February 22, 2013. The decision was May 2013. And when you say they submitted the fermentation document, it's the partially translated document? Yes. Yes, Your Honor. Sorry for not being clear. Because what I was asking you was, you haven't answered my question at all. I know you really wanted to go through this timing for some reason, but I really want an answer to my question, which is, is there any mechanism within this process, which went on for so many years, and so much ink was spent over these two paragraphs of untranslated material, is there any mechanism within this process at any point in time whereby Fufeng could have made a motion to supplement their filing with the translated paragraphs? I don't believe so, in the sense that the record was closed. That February 22, 2013 record, when Fufeng put this financial statement on... And they make a motion to reopen the record. Is there any mechanism for something like that? I mean, I think that's exactly what they tried to do at the Court of National Trade for all of those remand proceedings, is to say to the court, hey, court, why don't you allow commerce to reopen the record? Otherwise, I think it's in commerce's discretion whether to reopen the record and solicit this information. It's our perspective that... I guess what I'm trying to understand, I think it's the same thing Judge Moore is trying to understand, is Fufeng is the one that came forward with this document, this fermentation document. Yes, Your Honor. And now Fufeng is telling us, well, it was an oversight that this one piece, relatively small piece of the document, didn't get translated. And so you would think they would be the ones, assuming that it really doesn't have anything material in that content, would be motivated to try to supplement the translation. So it would provide a complete one to commerce, so commerce could fully evaluate the document. And so what I'm trying to figure out now is, to what extent is there anything in the record that shows Fufeng seeking to supplement the translation to correct what it says was an oversight? And I believe, Your Honor, and I'm sure they may have a different perspective, but the record was closed. So in the case briefs, which were just a few weeks after that document came on the record, was when both the other Chinese respondent and CP Calico pointed out in the case brief, hey, this is not a fully translated financial statement, but don't worry. You've got a fully translated financial statement on the record in the form of ajinomoto. Commerce said, you're right. It's not fully translated. We don't find it reliable. We're going to use the ajinomoto financial statement. And that's what happened. Then Fufeng appeals it, and the Court of Financial Trade, again, even initially, isn't saying to commerce, you have to translate it. Is it your view that commerce ought to have the authority to reject a non-fully translated version, or just anything, you know, la fecha is septiembre, you know, whatever? Like, you know, it's just like the date isn't translated. Is it your view that commerce has, whether it's a discretion or the right to choose to reject any document that is not fully translated, or do they have to make some analysis, like evolved in the various CIT remands, about whether or not the likelihood that the non-translated information is somehow vital to an assessment of the validity of the data? Well, I think in the context of financial statements for a surrogate value submission, which is what was going on here, commerce has a lot of discretion. They're using the best available information. They're looking at the other financial statements that are on the record and are fully translated, and then they're looking at, well, what is missing? You know, this was a financial note 12, which was an integral part of the financial statement. Every single page of the financial statement said that. The notes are an integral part, yet somehow this language was missing. This language informs commerce as to the meaning of the numbers that were in the table. The numbers are meaningful because that relates to depreciation and goes into the actual surrogate value ratio. Again, maybe try to listen to my question, and maybe it's because my questions are too long, so I'll make it really short. Do you think commerce has the discretion to simply reject it without giving a reason, or do you think commerce has to make an assessment of whether or not the non-translated material appeals appears to have some vital importance? Because commerce has initially just said, we're rejecting it, and CIT said, not good enough. You have to explain why it's vital, or why you think it might be vital, or whatever. And so I guess my question to you is, what should the legal standard be? Should commerce have the discretion to reject it without giving a reason, or should commerce have to articulate a basis for rejecting it based on some assessment of how vital it is? By the way, I find it hard to imagine that you could assess whether it's vital or not without knowing what it says. But apart from that, there does appear to be some precedent, not binding precedent, but some precedent in which commerce has made assessments of whether material appears to be vital or not. So you see the thing. There's two different, I promised shorter. I didn't get shorter. I'm sorry for that. Got longer. Yes, I know. But there's two different things we could possibly do here, consistent with what your client would wish, but I'm wondering which of those two would you prefer? Commerce has absolute discretion, unfettered discretion, or commerce has to determine they think it might be vital before they decide to exclude it? Well, I mean, commerce's regulations do require foreign language documents to be fully translated. So at the risk of coming back a year later and arguing something differently to you, I do think commerce does have discretion. But I do think there is something unique about the financial statements, which, again, is a surrogate value. Fufeng put a handful of financial statements on the record. A number of them were fully translated. So in this particular case, through all the various remands, we do have analysis from commerce explaining why it believed that the missing materials from the fermentation document are relevant to the whole question of depreciation, which then is going to impact the surrogate ratio calculations. But today, because it was just one short paragraph, according to what you tell us. Two paragraphs that were untranslated, Your Honor. Two short paragraphs. Right. We find that important. Right. And commerce provided analysis explaining why it felt, it believed it needed that information translated in order to fully understand the scope and meaning of the document. But you're going to hear from the, we're going to hear from the other side pretty soon saying, well, that's still not good enough. You don't just look at a document, conclude that there's a flaw in that document, and then knock out the document. Because what's really needed is a comparative analysis. What we have here are two defective documents, competing documents. Defective in different ways. We know about the Ajinomoto document that is infected with subsidies. And so that, in its own way, has a flaw in it. Now we have this document, the fermentation document. That has a chunk of it that isn't translated. So we don't know what it says with respect to depreciation. OK. Assuming that, I think what the trade court wanted is for commerce to explain and articulate why the Ajinomoto flawed document under these circumstances is the better information available than this document with the incomplete translation. And so to what extent do you think, number one, commerce actually did that? And number two, whether commerce needs to do that? Versus just blindly without looking at the Ajinomoto document say to itself, oh, there's a missing paragraph or two here. I'm knocking out this document completely. So I'm sorry for my long question, but it's really two questions. One, did commerce do what the trade court wanted it to do? And if so, where is that? OK. It's actually three questions. And then the final question is, what is it that they actually need to do? Can they actually ignore this weighing process? Right. Well, first, I think ultimately, we're most focused on that third remand, the court's third decision where they remanded it back. And the court did say something about the comparison. But then the court gave commerce an alternative where it said, or you could just tell us why you think this is vital, why this missing information was vital. And that is exactly what commerce did in its third remand determination. So it's my position that, yes, commerce did do what they were supposed to do. Again, we're in a very loose discretionary standard for commerce, the best available information for a surrogate value. Could you point me to the page of the trade court opinion that said, in the alternative, do apples to apples comparison. Or in the alternative, if you elect not to do an apples to apples comparison, please just explain to me in some detail why the missing information is so vital in your opinion. Sure. Appendix 85, top of the page. The court, well, it starts at the bottom of the page. The court, again, remands commerce's selection of surrogate financial data. Specifically, commerce should not select the Taijinomoto statements unless it first compares the Taijinomoto and Tai fermentation financial statements side by side in an even-handed manner. I'm sorry. You said 85? Yeah, 85. Starting on 84, bottom of 84. Okay, you're at 84. Sorry. Examining, evaluating the relative strengths and weaknesses of each. And then, skipping the parenthetical, this is what I was saying. In the alternative, commerce can reject the Tai fermentation statements after making a reasoned finding that the two untranslated paragraphs in footnote 12 are vital to the department's analysis of the data. To be clear, the court will not accept the truism that any missing information may be vital. Rather, commerce must specifically discuss what is missing from the Tai fermentation statements and how the fact of the missing information impedes the department's calculations. Which I believe commerce then spent three plus pages of their remand determination explaining exactly that. Depreciation is important. We can see on the face of these documents, there's a narrative that informs these numbers, the schedule that's included in the depreciation. So, I mean, again, we were completely shocked at the fourth judgment by the court because we felt that commerce had completely complied with the court's order here in the alternative. Okay, let's hear from the other side. Okay, can I just briefly touch on the xanthomonas compestris production strain, which is the second issue, which is that we think that that should be valued as a factor of production. Commerce valued it as an asset instead of an input into the product. But xanthan gum cannot be made without this production strain, xanthomonas compestris. So we think the statute requires commerce to value all the factors of production that go into the subject merchandise  Okay, thank you. Okay, Mr. Kahn. May it please the court, Jordan Kahn with Grunfeld Desiderio representing Apolli Fufeng. In answer to Judge Moore's question, yes, of course we translated those 10 lines. And we didn't find anything that would in any way impeach the reliability of the fermentation. Did you inform commerce about the content of the missing paragraphs? Your Honor, as my colleague, no. Well, at that point, the record was closed. Just to go back to timing, because I do agree with my colleague that it's important. When we filed, it was the last day and the record was open when we filed it. Then it was brought to our attention after the record closed during briefing. Not by Kelco, by the way. It was by the other respondent who wanted Malaysian financials. As soon as it was brought to our attention, we translated it, we realized there was no error, and we challenged at the CIT. And all throughout our comments on the briefing and all the remand comments, we have whole headings devoted to begging commerce to do the right thing and either translate it itself or let us do so. They've done both of those. But where's that in the record? That's in our, if you look at our remand comments, we have entire headings devoted to... So where does it plead with commerce to please allow you to submit a translation of those two paragraphs? JA-13-002, the court should order... I'm sorry, which volume is that? I don't know. This was a jumbled appendix that we did. It was a jumbled appendix. It was awful. Who created this appendix? It was a joint appendix, Your Honor. I beg them to put the numbers in sequential order. Not only are they not sequential, they go from 4,000 to 12,000, but the 12,000s are not even sequential because 12,000s that come after earlier 12,000s appear before it. It's absurd. Whoever did this, don't do it again. It looks like a monkey put this together. A robot, do you think? A real monkey or a fake one? No, a real monkey. We asked commerce to translate it because this court... I'm sorry, what page? 13-002. Where? 13-002. And where might that be? This joint appendix is a jumbled mess. Where is it? What volume? Volume 3. Is it 13-002? Is that it? Is that what you told me to look at? Yes. Okay, so I think it's in volume 3, right about this far. About this far. Towards the end? Yeah. I found 13-008, but the page before that is 8-320. Okay, do you have it? Read to us what you wanted to look at. Sure. The court should order the department to translate the two untranslated paragraphs. Translating the two paragraphs. Why didn't you request to provide the translation yourself? Why are you asking the trade court to order commerce to translate the two paragraphs? Commerce is very, very strict about keeping records closed. And in fact, they reopened the record on remand. They issued us a supplemental questionnaire. Wait, wait, wait, wait, wait. You're the one that has an interest in having the Fu Feng document considered. And so this is a problem of your making. A problem of your making. And so therefore, you did have some obligation to try to correct your erroneously translated document. Erroneous in the sense that you failed to translate the complete document. So if I had been in your shoes and truly believed that those two non-translated paragraphs really are not material, I would have done everything I could have to try to present the translated paragraphs to commerce. Instead, you're asking Daddy to order Mommy to do your work for you. And I don't really understand why you would pose it in that manner. Well, we felt that that was sufficient. That because the record was closed, that we would require either a court order or commerce on its own volition. And when they took the time to reopen the record to ask us more information, that would have been the perfect opportunity to do this simple task. Or they could have done it themselves as they've done in subsequent proceedings. I don't understand why you still, you keep blaming other people for your failure to do your own homework. Why didn't you try to volunteer to do your own homework? And you volunteered to try to present the translation. You could have easily just filed a motion and then had the translated document as an attachment and say, it's right here. I've done what I was supposed to do in the first instance, didn't. But here it is now. Now you should be rest assured that there aren't any problems with this document. Hindsight is 20-20, of course. We would rather have had that in the first place to perfectly translate. Logic is also pretty straightforward too. But, you know, we did cue this up. I mean, we appealed Commerce's denial. I mean, the fact that we didn't say, mother, may I, shouldn't invalidate. You didn't ask to do it at all. It's not like you didn't say, please. You didn't even make the request. How do I know you want me to pass the salt when you never mentioned the salt? We made it repeatedly to the court and also to Commerce in draft remand. You asked the, I'm sorry, because the point, what you pointed us to was you telling the court that it should order Commerce to do the translation. Where did you ask the court to allow you to submit the translation? Well, you know, in earlier remands, throughout our remand comments, we had a consistent theme was that, you know, this minor clerical error could be simply cured and that we could, that, you know, we should, that, you know, we did ask. We did lodge our objection. You know, look, we made a mistake, but the consequences have been severely disproportionate. As a result of these 10 lines, we've had to participate in four administrative reviews. And this court in NTN said that, you know, clerical errors should be fixed and that there shouldn't be, Commerce can't require perfection. And that perfection applies not only to the original submission, but maybe the fact that we, you know, should have queued it up better, but we crystallized our rights. We appealed this issue to the court in NTN. Just to be clear, there's nothing in the joint appendix that shows that you volunteered to try to fix this problem of your own making by providing the missing translation. Is that fair to say? The best you have is asking the trade court to order Commerce to fill in your gaps. Let me take a look. I think you may not find it now, but if there is something there. We will. We will supplement our submissions. And we appreciate that. Just as promptly as you can. We appreciate that. We will do that today, Your Honors. So, you know, just to, you know, to really put a fine point on it, there was nothing in those two paragraphs that could have invalidated Commerce's ability to calculate ratios. That's your problem, isn't it? Nobody knows what's in those untranslated paragraphs. Well, the question is whether that information would be vital to calculate the ratios. And the... Well, that's not clearly the question. I mean, yes, that's what CIT got to in his second or third remand, but Commerce asserted initially, and the domestic industry asserts, as I understand it, that Commerce's regulation gives it absolute discretion to reject untranslation documents with not fully translated. So nothing in that regulation says unless we determine it's vital. So, I mean, I understand that somehow this vital notion has been imported into the analysis, but I'm not sure it even belongs there. Well, this all goes down to Judge Chen's question on the best available information standard, and it requires a meaningful analysis. Commerce can't say this is missing one line or 10 lines, and therefore we are automatically going to reject it. They need to plumb the implications of the competing data sets, and here they failed to do it. But Judge Newman's question is an excellent one. How is Commerce supposed to know whether untranslated material is or is not vital? It's two paragraphs, 10 sentences in a financial statement. Maybe those 10 sentences are, oh, and by the way, I mean, we only did X, or we got subsidies, or whatever. Who knows what those 10 sentences are? And so I think Judge Newman's point, which is how can Commerce make a determination of vital, a perfect determination of vital, when it doesn't have the translated part? Well, I would say that there's nothing within the statement that casts doubt on those 10 lines. In fact, everything goes the other way. The depreciation schedule on note 12 is fully translated, and the depreciation methodology notes are fully translated. There's three of them, and they lay out in detail. So we know the numbers from the schedule. It looks like a mistake. We made a mistake. It looks like a mistake. However, not remedying the mistake to say that therefore all of these inferences and missing subject matter, I think that that goes too far. I would agree. This is an adverse inference that Commerce is making against us because of a clerical error. They have nothing in the record. And let me just answer this question about- I mean, we have to assume it's a clerical error, though. We don't know even that. And we don't know, I mean, Commerce, they have to police these proceedings the best they can, and they have to try to take in and rely on the information they get from all these interested parties. And if the interested parties don't do what they're supposed to do, then it makes Commerce's job that much tougher. And it's trying to incentivize the parties to give them the most complete information possible, not to incentivize them to provide incomplete information and then say, oh, these are just minor clerical mistakes. Right. But there has to be some reasonableness. First off, nobody's ever alleged that this was anything other than an unintentional oversight. And so for Commerce to now say, well, we're going to treat this as if it invalidates all of your data, we think that that goes way too far, especially when the consequences here are keeping us under order, whereas otherwise, using a perfectly valid financial statement, it could— It's not a perfect or a valid financial statement, right? Well, it's certainly valid for calculating ratios, which is— Well, I don't know what—so CIT ordered Commerce to go back and figure out, and I don't know what remand this is because there were so many, but they ordered them to go back and figure out whether it was vital. So now I'm looking at 8280 and 8281 of the appendix. It's in volume three, near the end. And here is where Commerce explains why—I understand this to be a fact-finding of sorts, that they are properly exercising their discretion to conclude that the document should not be  And so I specifically—I mean, they say, we find that footnotes regarding fixed assets are a key component of a company's financial statements, that the information set forth in the company's fixed asset footnote is vital to our surrogate ratio analysis for several reasons. And then they go through a bunch of reasons of why such information could be vital and important and a significant impact on the surrogate financial ratios that are otherwise disclosed. So I don't understand. I feel like now what's really happened is the Court of International Trade then said, OK, Commerce has done what I told it to do, which is determine whether or not this is vital. And they determined it's absolutely vital, and they gave a lot of reasons. I feel like at that point, the CIT needed to evaluate or assess that under an incredibly deferential standard, which I didn't see it doing. Well, let me just clarify the Court's order, because this is what my colleague was talking about. Page 85. They do give Commerce these options. However, if you look at— Oh, that's later. That's the last one, right? No, no, no. That was the one that ledged the remand that you were just talking about. OK, that's what I was wondering. So if you look at page 85 in the appendix— Hold on. I've got to find it. I'm sorry, what page? 85. OK. Look at the third paragraph that said, ordered. You'll see Judge Goldberg is giving two distinct options. Commerce picked the latter. The latter was making a fact-sensitive finding that the fermentation statements are missing vital information. What he got back from Commerce was generic concerns about depreciation. Nothing about why the numbers were impugned. Well, because we don't know, because the footnote attached to the numbers wasn't translated. So that's the whole problem. It's like you want to hold Commerce to a standard for assessing vitality that would require them to know what the missing information says. Well, if they didn't translate, and they were the ones that refuted— we argued that that was an abuse of discretion. That was consistent throughout. Then they have to make a fact-sensitive finding. The Best Available Information Standard doesn't let them say, we're automatically going to disqualify based on these 10 lines, especially when— Actually, they did initially say, we're automatically going to disqualify based on these 10 lines. But by this remand, they were saying, we decide these 10 lines are vital to our ability to rely on this data. And they explain why. Based on generic, non-record depreciation concerns. Because nobody knows what those two paragraphs say. They can't do it with specificity. But what they didn't do is look at the Aginomoto statement. There's no doubt that it's impugned by subsidy. If you look at Note 25, 13% of their fiscal year sales income was attributable to subsidized export promotion. So Commerce decided that that was somehow better available information than the unknown, better the devil you know kind of thing, I guess. And that is a very discretionary choice by them. I just don't understand how courts are getting in the business of ordering these kinds of remands. They have discretion to compare, to do the complex, you know, meaningful analysis. They don't have discretion to completely say, well, we're not going to consider the Aginomoto flaw. Where did they talk about these malignant subsidies that distorted the Aginomoto data? That's nowhere on the record. They wanted— they were fixated. They had prejudged that they were going to use that statement to keep us on order. The CIT picked up on that. And we think, rightfully so, as the CIT and this court often do— So to be clear, you're saying there's no bad faith on your client's part, but there's absolutely bad faith on Commerce's part. We think there was prejudgment and that they were unwilling to meaningfully compare the Aginomoto distortion vis-a-vis these 10 lines. That they never did. In your view, what should Commerce have done with respect to analyzing Aginomoto that it did not do? I mean, I see at 8244, at least in one of the remands, Commerce saying at the bottom paragraph, in contrast to the fermentation financial statements, although they show evidence of counteravailable subsidies, Aginomoto's financial statements are complete and reliable and all parties to this proceeding have been afforded the opportunity to comment on their full content. Furthermore, because they are complete, there's no risk that a party to this proceeding has withheld or omitted information from Aginomoto's financial statements. So that's Commerce providing its commentary on Aginomoto. What more should they have done? They should have plumbed the implications. What does it mean to be— Can you give me a little more than that? What does it mean that there was 13 percent of their sales income was attributable to these Thai programs that are per se counteravailable and that Commerce routinely rejects financials on this basis, as this court affirmed recently in China Kingdom? So for them to do what they've done here, which is to just really give one line and say, well, it's complete and yeah, even though it has subsidies, move on, there was no meaningful comparison of what it meant to be subsidized and why that data was subsidized. At core, what Commerce did wrong was to accept hypothetically—to say that known distorted data was preferable to hypothetically flawed. They said those 10 lines have got to conceal an inference without any record basis worse than this malignant subsidy that metastasizes the financial statement and renders the Aginomoto statement unusable for ratio calculation. Okay, let's hear from your colleague. Thank you, Your Honors. Ms. Krasiniak? Thank you, Your Honor. Do you have new issues to raise in defense? Yes, Your Honor. So the United States is only taking a position with regard to the evaluation of the X-compestorous bacterial strain. Why? Why isn't the U.S.—I mean, you applied—you used the Aginomoto data under protest, that's what the decision says, correct? Yes, Your Honor. Under protest? Yes. Meaning, we don't agree? Yes. The Department of Justice did not receive authority to appeal that issue, and so we have not taken a position on it today. And so we've only taken a position with regard to the evaluation of the X-compestorous bacterial strain. Am I to infer from that that the government no longer believes it was under protest, or would you have corrected that if you believed that that was an error? Unfortunately, Your Honor, I believe that would get into the internal deliberations within the Department of Justice and our decisions whether or not to seek appeal. As I'm sure the Court is aware, there's many stages required to seek an affirmative appeal, and I cannot speak to that, unfortunately, because it does get into, I believe, privileged internal deliberations within the Department of Justice. I've just never seen a CIT judge strong-arm commerce as much as I saw it here, and I was really surprised that the government didn't suggest as much in its brief and defend commerce's discretion. And, you know, I got to tell you, I mean, I really think the CIT judge exceeded his The only thing stopping me from saying that is a concern about why in the world the government doesn't agree, necessarily. It's not that we agree or disagree. As the Court noted, we did follow the Court's order under protest, and we do not take position at this stage. We did not receive authority to appeal it, and so, unfortunately, I cannot take a position on that today, Your Honor. So, hypothetically, if we were to reverse the trade court and say we agree with commerce's initial determination to use the Ajinomoto statement over the Flementation statement, commerce wouldn't be displeased with that? It wouldn't somehow create some kind of confusion inside of commerce operations? Obviously, the commerce would act in accordance with any order issued from this Court, as far as the— I just want to make sure that if we were to do that, commerce isn't already on some new program internally, where it has abandoned its earlier practice that it used initially here, and then would have to unspool that new internal approach, given a reversal here. To my knowledge, there's not necessarily been a shift in the way it's practiced there. There's obviously discussion about the statute with regards to requiring untranslated statements, et cetera, this morning by the attorneys that spoke before me. So, to my knowledge, not. Obviously, it was taken under protest, but we would obviously comply with any order that was issued out of this Court. So, if a party submits a partially translated document today in an investigation, what does commerce do? Again, Your Honor, we do not take a position on that issue here. I'm not asking you to take a position here. I want to know what commerce's practice is here, and that's what I need from you. Certainly, Your Honor. My understanding would be that they would comply with the regulation and insist on a fully translated document. Well, what if the record had technically closed? Would they say, well, the record is technically closed, and when I reviewed the current record, I see a only partially translated document here. So, therefore, I'm just going to strike it because it's not fully translated. Or would commerce say, hey, you only translated 90% of this. I need the other 10% because I think it's important. Please give me a fully translated document. Which is the practice of commerce? Again, I hope you understand my hesitation just because we've not taken a position on this case. If you say you don't know because you're just a little old Justice Department attorney, that's fine. But, I mean, I'd want to know if you know. And if you do know, I'd like you to tell me. Your Honor, I am not personally aware of what their current practice is other than, obviously, the regulation does require fully translated invoices to be submitted. So, if I may speak briefly to the issue of the evaluation of the ex-compestuous bacterial strain. The plaintiff appellee essentially argues that the Department of Commerce erred in not assigning a separate value to that bacterial strain because it's a factor of production. And so, by jumping straight to this conclusion that the bacterial strain is a factor of production, their argument would follow. Yes, of course, then you have to assign a value to that factor of production that the statute does provide for that. However, that skips the first part of the analysis, which is also contemplated by 1677B, which is where Commerce looks at all of the information available to it and determines whether or not something is a factor of production or is to be included within the, essentially, overhead expenses. And so, with the bacterial strain that we have here, it's a strain that the right to And that was prior to the period of review. It's uncontested that the bacterial strain is self-replicating, which means that the bacteria stays the same throughout its lifeline. There's no, even though it's a license, not an actual ownership of that bacterial strain, there's no ongoing fees associated with the payment for the bacterial strain. And so, it's not that Commerce decided that there was no value associated with that bacterial strain, but rather that that value is already reflected in the surrogate invoices because the tie manufacturers similarly produce additives that require the use of a bacterial strain. So, that would be included in the overhead amounts for those tie producers.  Thank you, Your Honor. Okay, Ms. Noonan, you have your rebuttal. Thank you, Your Honor. Nancy Noonan for the record. Just to revisit the financial statement issue one last time. It is up to the parties. The parties are responsible for creating the adequate record. Again, I hope I'm finally making myself clear about how the timeline is important. As soon as one of these cases against China is filed and initiated, parties are on notice that they need to put surrogate values on the record for these financial ratios. So, as of July, the initiation, everyone involved in the case knew that they had a window of time to get these documents on the record. Fufeng did not put that financial statement on the record until end of February, a post-preliminary surrogate value submission. Again, totally still timely, but my point is, I don't know why it didn't go on the record until that late, but errors happen. Perhaps if it had gotten on earlier, somebody would have noticed it sooner and the record still would have been open for them to fix it. But that's not how it played out. And again, it's up to the parties to create an adequate record. Two, I do take issue with my colleague's statement that the Ajinomoto financial statements were distorted. There is no finding of distortion. Yes, there's a finding that there were subsidies, but Commerce has said, and we don't disagree at all that Commerce has a normal practice of not using financial statements with subsidies when there is other reliable information on the record. Here, Commerce, in its discretion, said that was not the case. So yes, there are subsidies, but there's no evidence of this distortion. Finally, on the valuation of the xanthomonas compestris, again, the statute requires that all of the factors production going into the subject merchandise be valued. Xanthomonas compestris goes into it. There is no xanthan gum without this bacterial strain. The fact that it was purchased in 2002 is completely irrelevant. We are in a non-market economy case where factors of production need to be valued. There's no questions. Thank you for your time. We're fine. Thank you. Thank you all. The case is taken under submission. And that concludes our session for today. All rise.